John K. Bennett, Esq.
Daniel D. Schudroff, Esq.
Ryan C. Chapoteau, Esq.
JACKSON LEWIS P.C.
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4000
        -and-
200 Connell Drive, Suite 2000
Berkeley Heights, New Jersey 07922
(908) 795-5200
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

DAVID CHIU,

                 Plaintiff,

    vs.

ANHEUSER-BUSCH   INBEV   SA/NV
and DUSAN VUJOVIC,

               Defendants.

------------------------------------------------------x

Hon. _____, U.S.D.J.

Civil Action No. _____

**NOTICE OF REMOVAL**

TO:   THE CHIEF JUDGE AND JUDGES OF THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK

                This Notice of Removal by Defendants, Anheuser-Busch InBev SA/NV, having

its headquarters and principal place of business located in Leuven, Belgium, and Dusan Vujovic,

an individual whose residence is located in the State of Florida, respectfully show, in accordance

with the provisions of 28 U.S.C. § 1446, that this action is properly removed from the Supreme

Court of the State of New York, New York County, to this United States District Court, as

follows:

          1.      Plaintiff David Chiu has brought a civil action against Defendants in the Supreme

Court of the State of New York, New York County, captioned as "David Chiu vs. Anheuser-

Busch InBev and Dusan Vujovic," Index No. 654483/2021, commenced by the filing of a Verified Petition July 20, 2021, a copy of which is attached hereto as Exhibit A.

2.      On July 20, 2021, Plaintiff's counsel sent a copy of the Verified Petition to Defendants' counsel by e-mail.

3.      No proceedings have taken place in the New York State court action.

4.      Defendants have not served any answer or responsive pleading to Plaintiff's Verified Petition or made any appearance or argument before the Supreme Court of the State of New York.

5.      This Notice of Removal is timely filed, pursuant to 28 U.S.C. § 1446(b), thereby allowing Defendants to remove, pursuant to 28 U.S.C. §§ 1332 and 1441, on the basis of this Court's diversity-of-citizenship jurisdiction.

6.      This action arises out of Plaintiff's claim that his employment with Anheuser-Busch, LLC was unlawfully terminated in November 2020. Plaintiff was employed by Anheuser-Busch, LLC, in New York, New York.

7.      This action is removable to this Court based on its diversity-of-citizenship jurisdiction, pursuant to 28 U.S.C. § 1441.

   a.   Specifically, Plaintiff resides in the State of New Jersey; therefore, he is a citizen of the State of New Jersey (See Verified Petition, Exh. A, ¶ 5).

   b.   Defendant Anheuser-Busch InBev SA/NV is, and at the time of the filing of the Verified Petition and the filing of this removal petition was, a corporation having its headquarters and principal place of business located in Leuven, Belgium. (See Verified Petition, Exh. A, ¶ 6).

    c.   Defendant Dusan Vujovic is, and at the time of the filing of the Verified Petition and the filing of this removal petition was, an individual whose residence is located in the State of Florida; therefore, he is a citizen of the State of Florida.

8.    The entire amount in controversy, while not specifically enumerated in Plaintiff's Verified Petition, appears to contemplate an amount exceeding the sum or value of $75,000.00.

9.    Because there is complete diversity between the parties, and the amount in controversy is in excess of $75,000, this Court has original jurisdiction over Plaintiff's claims by virtue of diversity of citizenship and satisfaction of the amount-in-controversy requirement of 28 U.S.C. § 1332; therefore, this action is properly removable to this Court, pursuant to 28 U.S.C. §§ 1332(a) and 1441(b).

10.    This Notice of Removal will be filed promptly with the New York State Court, as required by 28 U.S.C. § 1446(d).

11.    By copy of this document and in accordance with the Certificate of Service, Defendants are providing notice to all parties in this action of the filing of this Notice of Removal pursuant to 28 U.S.C. § 1446(d).

12.    Defendants file this Notice of Removal without waiving any defenses to the claims asserted by Plaintiff, including relating to valid service of process and without conceding that Plaintiff has pled claims upon which relief can be granted.

WHEREFORE, Defendants submit respectfully that this action proceed in its entirety in this Court as an action properly removed hereto.

Respectfully submitted,
JACKSON LEWIS P.C.
666 Third Avenue, 29th Floor
New York, New York 10017
             -and-
200 Connell Drive, Suite 2000
Berkeley Heights, New Jersey 07922
Attorneys for Defendants

By: /s/ Daniel D. Schudroff, Esq.
       Daniel D. Schudroff, Esq.

Dated: July 29, 2021

## **CERTIFICATE OF SERVICE**

   This is to certify that a true and correct copy of the foregoing Notice of Removal was electronically filed and served via ECF on all the parties in the case. In addition, a true and correct copy of the foregoing document was served via UPS overnight mail and e-mail on the following counsel of record for Plaintiff:

Tiffany Ma, Esq.
Young & Ma LLP
575 Lexington Avenue, 4th Floor
New York, New York 10022
tma@youngandma.com

-and-

Michael P. Pappas
Michael P. Pappas Law Firm, P.C.
3 Columbus Circle, 15th Floor
New York, New York 10019
michael@pappaslawfirm.com.

/s/Daniel D. Schudroff
Daniel D. Schudroff

4849-8030-3604, v. 6

# **EXHIBIT A**

Case 1:21-cv-06460-LAP   Document 1   Filed 07/29/21   Page 7 of 59

YOUNG & MA, LLP
Tiffany Ma, Esq.
575 Lexington Avenue, Suite 4085
New York, New York 10022
T: (212) 971-9773
F: (866) 839-4306

MICHAEL P. PAPPAS LAW FIRM, P.C.
Michael P. Pappas, Esq.
3 Columbus Circle, 15th Floor
New York, New York 10019
T: (646) 770-7890
F: (646) 417-6688

Attorneys for Petitioner
 David Chiu

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DAVID CHIU,

                          Petitioner,

              -against-

ANHEUSER-BUSCH INBEV SA/NV and DUSAN
VUJOVIC,

                      Respondents.

Index No.

**<u>VERIFIED PETITION</u>**

Petitioner David Chiu, as and for his Petition against Respondents Anheuser-Busch

InBev SA/NV and Dusan Vujovic, hereby alleges:

1.       This is a special proceeding to stay arbitration pursuant to CPLR 7503(b).

Petitioner seeks to stay arbitration of his employment discrimination claims under Title VII

of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law

("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), on the grounds

that the purported arbitration agreement is unlawful, fraudulent, unconscionable, and

against public policy.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this proceeding pursuant to CPLR 7502 and 7503(b). Petitioner has not participated in the arbitration and has not made or been served with an application to compel arbitration for purposes of CPLR 7503(b). Respondents filed a demand for arbitration with the American Arbitration Association on June 22, 2021, but Petitioner has not actively participated in the arbitration other than appearance by counsel with a reservation of rights. No substantive arbitration proceedings or arbitrator selection have yet taken place.

3.      Venue in this Court is proper pursuant to CPLR 7502 because the parties seeking arbitration reside and/or do business in New York County.

4.      Respondents are subject to personal jurisdiction in New York pursuant to CPLR 301 and/or 302 because they do business here, reside here, or both.

## THE PARTIES

5.      Petitioner David Chiu is an adult male of Asian ethnicity who resides in the State of New Jersey, and was employed by Respondents in the State and City of New York. At all relevant times, Mr. Chiu was an "employee" of Respondents within the meaning of the NYSHRL and NYCHRL, and also an "employee" of the corporate Respondent under Title VII.

6.      Respondent Anheuser-Busch InBev SA/NV ("AB") is a multinational drink and brewing company based in Leuven, Belgium. With a market cap of $100+ billion and annual revenue around $50 billion, AB has approximately 400 beverage brands and about 170,000 employees. AB's wholly-owned subsidiary, Anheuser-Busch Commercial Strategy, LLC (a foreign corporation domiciled in Delaware), has a New York City address

at 125 West 24th Street, New York, New York 10011. AB has a sizable employee population in New York City (over 200 employees), where Mr. Chiu reported to work. At all relevant times, AB was an "employer" of Mr. Chiu within the meaning of Title VII, the NYSHRL, and the NYCHRL.

7.      Respondent Dusan Vujovic is employed at AB as President, High End, and is in New York City to supervise and direct AB employees. At all relevant times, Vujovic was a supervisory agent of AB, controlled the terms and conditions of Mr. Chiu's employment, supervised Mr. Chiu, and actively participated in the unlawful discrimination and retaliation against Mr. Chiu. Therefore, Vujovic was an "employer" of Mr. Chiu within the meaning of the NYSHRL and NYCHRL, and/or an "aider or abettor" under those statutes.

8.      Respondents AB and Vujovic are hereinafter referred to collectively and individually as "Respondents."

### FACTS

9.      Petitioner Chiu is a former employee of Respondents who was subjected to egregious discrimination, retaliated against, and terminated by Respondents in violation of Title VIII, the NYSHRL, and the NYCHRL. The particulars of Mr. Chiu's employment and Respondents' unlawful conduct are set forth in Mr. Chiu's Verified Complaint to the New York City Commission on Human Rights dated July 1, 2021, annexed to this Petition as Exhibit A (the "NYC Commission Complaint").

10.     AB has a mandatory "Dispute Resolution Program Policy" (the "DRP"), which is presented to employees on a "take it or leave it" basis with no opportunity for negotiation and no ability to "opt out" of the program. The DRP is presented as a required

condition of continued employment, *i.e.*, an employee who does not wish to participate would have to leave the company. Employees have no meaningful choice but to accept the policy. A true copy of the DRP is annexed to this Petition as Exhibit B.

11.     When Mr. Chiu was hired by AB in China in or about 2011, he does not recall ever receiving a copy of the DRP, either in writing or electronically, and has no recollection of ever seeing it during the hiring process of subsequently. Further, he has no recollection of ever being trained with respect to the DRP, or of anyone at AB ever even mentioning the DRP, during the time he was employed in China.

12.     Likewise, when AB transferred Mr. Chiu to New York in 2016, Mr. Chiu does not recall ever receiving a copy of the DRP, either in writing or electronically, and has no recollection of ever seeing it subsequently during his employment. Further, he has no recollection of ever being trained with respect to the DRP, or of anyone at AB ever even mentioning the DRP, during the time he was employed in United States. In fact, the first time Mr. Chiu remembers seeing the DRP was on the date of his termination by AB, when it was referenced in his termination meeting. Thus, it does not appear that AB took sufficient steps to ensure that Mr. Chiu and other employees were actually aware of the DRP and provided their informed consent.

13.     Although purporting to be a binding "contract," the DRP gives AB the unfettered and unilateral right to change its terms (or terminate the program entirely) at any time, stating: "The Company may, at its sole discretion, modify or discontinue the DRP at any time by giving Employees 30 calendar days' notice." (DRP at p. 3.) If AB modified the DRP during Mr. Chiu's ten years of employment, he does not recall ever being provided 30 days' notice (or any notice at all) of such modification(s).

4

14.     The DRP contains a three-step dispute resolution process. Completion of each step is mandatory before employees are permitted to move to the next step. ("Employees must complete each level of the process before proceeding to the next level.") (DRP at p. 2.)

15.     The first step in the process ("Level 1") is "Local Management Review". Employees are required to submit any dispute to Human Resources for local management review within 180 days of when the dispute arose or within the statute of limitations period applicable to the claim, whichever is longer. (DRP at pp. 2, 7.) The DRP provides that an employee who does not initiate a Level 1 review within the required time period is deemed to have "waived and released" the claim. (DRP at p. 6.)

16.     The second step in the process ("Level 2") is "Mediation," in which an "independent mediator helps the Employee and the Company open lines of communication in an attempt to facilitate a resolution." Employees are required to submit any dispute to Level 2 mediation within only 30 calendar days of the Level 1 determination, and to pay an initiation fee of $50.00. (DRP at pp. 8-10.)

17.     The third and final step in the process ("Level 3") is "Binding Arbitration" before the American Arbitration Association ("AAA"). Employees are required to submit any dispute to Level 3 arbitration within only 30 calendar days of unsuccessful Level 2 mediation, and to pay an initiation fee of $125.00. (DRP at pp. 11-18.)

18.     In addition to the fact that Mr. Chiu never actually agreed to the DRP during his employment, the DRP as a whole (and the binding arbitration process in particular) contains several problematic provisions that render it legally unenforceable, including expressly unlawful provisions; false, fraudulent, and misleading statements; procedurally

5

and substantively unconscionable provisions; and provisions that have the purpose and effect of contravening federal, state, and city public policies.

19.     The DRP's binding arbitration provision purports to cover claims for "[e]mployment discrimination and harassment … based on, for example, age, race, sex, religion, national origin, veteran status, citizenship, disability, or other characteristics protected by applicable laws." (DRP at p. 5.) However, mandatory arbitration of such claims is expressly proscribed by New York law. *See* CPLR 7515. *See also Newton v. LMVH Moet Hennessy Louis Vuitton Inc.*, 2020 N.Y. Misc. LEXIS 3288, 2020 NY Slip Op 32290(U) (Sup. Ct. N.Y. Co. July 10, 2020) (Nock, J.). Therefore, the DRP's mandatory arbitration provision is "null and void" with respect to Mr. Chiu's claims under Title VII, the NYSHRL, and the NYCHRL. *Id.*

20.     The DRP impermissibly and drastically reduces the statutory limitations period for bringing discrimination claims. The limitations period for bringing formal claims of employment discrimination under the NYSHRL and NYCHRL is three years for civil actions and one year for administrative complaints. *See* N.Y. Exec. Law § 297(5); *Koerner v. State*, 62 N.Y.2d 442, 478 N.Y.S.2d 584 (1984); N.Y.C. Admin Code § 8-109(e), § 8-502(d). With respect to Title VII claims, employees have 300 days in which to file a formal charge with the Equal Employment Opportunity Commission ("EEOC"). *See* 42 U.S.C. § 2000e-5(e)(1). However, under the DRP, an employee has only *thirty days* to decide whether to file for arbitration if the dispute cannot be voluntarily resolved by the parties. (DRP at p. 11.) The grossly truncated limitations period is unreasonably short and, therefore, unconscionable and contrary to public policy. Also, as detailed below, the short limitations period effectively deprives employees of the statutory right to have their claims

6

heard and investigated by governmental agencies, including the EEOC, New York State Division of Human Rights, and New York City Commission on Human Rights.

21.     The DRP repeatedly, falsely, and fraudulently tells employees that the arbitrator is empowered to award all remedies provided under the employment discrimination statutes, when that is clearly not true. In the DRP "Questions and Answers For Employees," which employees would have considered and relied upon, AB tells its employees: (i) "The Arbitrator … can provide any remedy that could have been granted by a judge or jury in a court trial of the particular claim"; (ii) "There is no difference in the type of relief available"; and (iii) "The Arbitrator has the same authority as a judge or jury in making awards to Employees. That means in arbitration, it's possible for you to recover anything you might seek through the court system." (DRP at pp. 21-23.) Each of these statements is demonstrably and knowingly false. By the very terms of the DRP itself, the arbitrator is <u>not</u> empowered to award the same relief as a judge or jury.

22.     First, the DRP expressly states that the arbitrator is *not* authorized to order equitable relief in the form of reinstatement if AB objects for any reason:

> 14.2  Upon a finding that a party has sustained his or her burden of persuasion, the Arbitrator shall, **except as provided by Article 13 (Authority of the Arbitrator) and Article 16 below (Front Pay Option Instead of Reinstatement)**, have the same power and authority as a judge or jury in a court trial to grant any relief available under applicable law in the relevant jurisdiction.
>
> 16.1  If the Arbitrator orders the reinstatement of a terminated Employee, there may be situations where … the Company does not wish to reinstate the Employee. In such situations, the Arbitrator, at the request of either party, **shall** issue a supplementary award granting front pay instead of reinstatement, in accordance with the applicable state or federal law.

(DRP at pp. 16-17) (emphasis supplied).

23. Second, the DRP expressly provides that the arbitrator is *not* authorized to award any equitable relief that is directed at AB's employment policies or practices: "13.3 The Arbitrator **shall not** diminish the Company's authority to establish, revise, interpret or administer its policies, procedures, rules and/or practices." (DRP at p. 16) (emphasis supplied).

24. Thus, despite AB's repeated written assurances to employees that they are entitled to the *exact same* relief available in a court of law, the DRB explicitly limits and removes the arbitrator's authority to award significantly important relief provided for under the anti-discrimination statutes, *i.e.*, orders of reinstatement and orders directing the employer to eliminate discriminatory policies and practices, both of which are available under Title VII, the NYSHRL, and NYCHRL, and have been recognized as important remedies to deter and remediate unlawful discrimination. Specifically:

a. Title VII, 42 U.S.C. § 2000e-5(g) ("If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may **enjoin** the respondent from engaging in such unlawful employment practice, and **order such affirmative action** as may be appropriate, **which may include**, but is not limited to, **reinstatement** or hiring of employees …, or **any other equitable relief** as the court deems appropriate.") (emphasis supplied);

b. NYSHRL, N.Y. Exec. Law § 297(4)(c) & (9) ("If, upon all the evidence at the hearing, the commissioner shall find that a respondent has engaged in any unlawful discriminatory practice as defined in this article, the commissioner shall … cause to be served on such respondent an order … including such of the following provisions as in the

judgment of the division will effectuate the purposes of this article: (i) requiring such respondent to **cease and desist** from such unlawful discriminatory practice;(ii) requiring such respondent to take such **affirmative action**, including (but not limited to) hiring, **reinstatement** or upgrading of employees…, the extension of full, equal and unsegregated accommodations, advantages, facilities and privileges to all persons…; (iii) awarding of compensatory damages to the person aggrieved by such practice; (iv) awarding of punitive damages … to the person aggrieved by such practice; (v) requiring payment to the state of profits obtained by a respondent through the commission of unlawful discriminatory acts …; and (vi) assessing civil fines and penalties …; (vii) requiring a **report of the manner of compliance**…. Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, including, in cases of employment discrimination related to private employers and housing discrimination only, punitive damages, **and such other remedies as may be appropriate**) (emphasis supplied);

c.   NYCHRL, N.Y.C. Admin Code § 8-120(a), § 8-502 ("If … the commission shall find that a respondent has engaged in any unlawful discriminatory practice …, the commission shall … issue … an order requiring such respondent to **cease and desist** from such unlawful discriminatory practice or acts of discriminatory harassment or violence. Such order shall require the respondent to take such **affirmative action** as, in the judgment of the commission, will effectuate the purposes of this chapter …including, but not limited to: (1) Hiring, **reinstatement** or upgrading of employees; (2) The award of back pay and front pay;… (5) The extension of full, equal and unsegregated accommodations, advantages, facilities and privileges;… (8) Payment of compensatory damages to the

9

person aggrieved by such practice or act;. (9) Submission of **reports with respect to the manner of compliance**…. [A] person aggrieved by an unlawful discriminatory practice … shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, **and for injunctive relief and such other remedies as may be appropriate**….") (emphasis supplied);

      d.  *Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 229-30 (2d Cir. 2006) ("[E]quitable relief lies at the core of Title VII, which expressly provides for non-monetary relief such as reinstatement…. Under Title VII, equitable relief is not incidental to monetary relief. We, as well as other circuits, have repeatedly emphasized the importance of equitable relief in employment cases…. Under Title VII, the best choice is to reinstate the plaintiff, because this accomplishes the dual goals of providing make-whole relief for a prevailing plaintiff and deterring future unlawful conduct…. Reinstatement advances the policy goals of make-whole relief and deterrence in a way which money damages cannot.") (citations and internal quotation marks omitted).

      25.    By denying Mr. Chiu and other employees core equitable remedies under the anti-discrimination statutes, which would unquestionably be available and accorded significant importance in a court of law and before the administrative agencies, the DRP deprives employees their statutory right to full make-whole relief, contravenes the strong public policy in favor of reinstatement and other equitable measures to eliminate discrimination and deter unlawful conduct, and interferes with federal, state, and local agencies' authority to take affirmative actions to ensure compliance.

      26.    Furthermore, AB's repeated, material misrepresentations in the DRP that the arbitrator is authorized to award all relief available in a court, means that Mr. Chiu's

and other employees' acceptance of the DRP was procured by fraud, and, therefore, unenforceable as against Mr. Chiu.

27.     In addition to the above limitations on the arbitrator's authority, the DRP is clearly designed to: (i) prevent or deter employees from exercising their statutory right to have their claims investigated and addressed by government agencies; and (ii) shield AB from the scrutiny of those agencies with regard to its employment practices and policies. Although the DRP nominally states that it is not "intended to discourage or interfere with the legally-protected rights of Employees to file administrative claims or charges with government agencies," its provisions have precisely that effect. Among other things, the DRP:

a.     Advises employees that AB will seek to have the agency "defer its processing of the charge until the Employee and the Company complete the DRP," thus depriving employees of the benefit of the agency investigatory process, agency cease and desist orders, and other potential agency actions favoring the employee, until it is too late, *i.e.*, after the "final and binding" arbitration is already over and there is little interest or incentive by the agency to prosecute the charge. (DRP at p. 3.)

b.     Unlawfully requires employees to agree that "they will first use the DRP for any covered claims before filing or pursuing any legal, equitable, **administrative** or other formal proceeding." (DRP at p. 6) (emphasis supplied). This deprives employees of their legal right to pursue administrative charges with federal, state, and city agencies prior to, or concurrently with, the DRP process.

c.     Gives employees only 30 days to request arbitration, after which AB *immediately* initiates arbitration proceedings. (DRP at p. 11.) Employees are thereby

11

deprived of any realistic opportunity to thoroughly evaluate and prepare their claims, submit them to a fair employment practice agency for investigation, or obtain any benefits from a thorough and proper agency investigation of AB's conduct. With respect to Title VII, employees are also deprived of the opportunity to exhaust administrative EEOC filing requirements (a prerequisite to pursuing a Title VII claim) prior to arbitration, which effectively denies employees any remedy under that statute. *See* 42 U.S.C. § 2000e-5(f)(1). Furthermore, given the DRP's arbitration initiation process, which is hasty and rushed by design, the appropriate agencies have little or no opportunity to investigate and remediate AB's discrimination in any meaningful way prior to the arbitration, allowing AB to: (i) effectively avoid any government scrutiny for its conduct; and (ii) deprive employees of a potentially valuable ally and resource for obtaining justice. The agencies' role in investigating and remediating unlawful discrimination is thereby diminished in a way that is contrary to public policy and the public interest.

28.    The DRP is fatally defective for the additional reason that it expressly denies Mr. Chiu and other claimants the right to potentially highly-relevant discovery documents and information that an employee might need to prosecute his or her case. Specifically, the DRP provides that its discovery provisions "do not require either party to provide information to the other party that is proprietary, confidential, privileged, classified, or trade-secret information." (DRP at p. 13.) Thus, under the DRP, documents and information that AB deems "proprietary," "confidential," or "classified" are expressly exempted from all discovery, on a blanket basis and without any qualification – despite the fact that employment discrimination claimants (including Mr. Chiu) often need to rely upon such information in order to prove their claims. Moreover, the DRP provides no definition

12

of what constitutes "proprietary," "confidential," or "classified" information, no mechanism for determining whether the information was properly so classified, and no way for a claimant to determine what documents and information are being withheld on that basis.

29.     In sum, the DRP: (a) is not binding because AB never obtained Mr. Chiu's assent to the policy; (b) is unlawful on its face under New York law in that it purports to mandate arbitration of employment discrimination claims in contravention of CPLR 7515; (c) is unenforceable to the extent is was procured by fraud and/or material misrepresentations regarding the remedies available in arbitration; and (d) is contrary to important public policies, and is procedurally and substantively unconscionable, in that it (i) deprives employees of core equitable remedies under the anti-discrimination statutes, (ii) reduces the limitations period for discrimination claims to an unreasonably short period (*i.e.*, 30 days); (iii) effectively deprives employees and governmental agencies of any realistic opportunity to assert, investigate, and remediate administrative discrimination claims prior to arbitration, and, indeed, actively seeks to interfere with that process; and (iv) gives AB the unilateral right to withhold from discovery any documents and information it deems confidential, regardless of relevance. Therefore, a "valid agreement [to arbitrate] was not made," and a stay of arbitration is appropriate pursuant to CPLR 7503(b).

13

WHEREFORE, Petitioner respectfully requests that an order be issued pursuant to CPLR 7503(b):

(1)     Permanently staying arbitration between Petitioner and Respondents, and permitting Petitioner to pursue all non-arbitration remedies and proceedings permitted by law; or, alternatively;

(2)     Staying arbitration between Petitioner and Respondents pending completion of the processing and investigation of Petitioner's NYC Commission Complaint, up to and including any administrative hearing prosecuted by the NYC Commission under the NYCHRL; and

(3)     Granting Petitioner such other and further relief as the Court may deem just, equitable, and proper.

Dated: New York, New York
          July 20, 2021

                              By: ___s/Tiffany Ma, Esq._____
                                   Tiffany Ma
                                   Young & Ma LLP
                                   575 Lexington Avenue, 4th Floor
                                   New York, NY 10022
                                   T: (212) 971-9773
                                   F: (212) 600-2301
                                   tma@youngandma.com

                                   Michael P. Pappas
                                   Michael P. Pappas Law Firm, P.C.
                                   3 Columbus Circle, 15th Floor
                                   New York, New York 10019
                                   T: (646) 770-7890
                                   F: (646) 417-6688
                                   michael@pappaslawfirm.com

14

Attorneys for Petitioner
David Chiu

## VERIFICATION

STATE OF NEW JERSEY )
                                    ) ss.
COUNTY OF BERGEN        )

I, David Chiu, being duly sworn, hereby affirms that the facts stated in the foregoing Verified Petition are true and accurate to my knowledge, except as to matters alleged on information and belief, and that as to those matters I believe them to be true.

_____
David Chiu

Sworn to this 20 day
of July, 2021

_____
Notary Public

**SHREYAS S SHAH**
ID # 2218019
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires Sept. 22, 2023

16

Case 1:21-cv-06460-LAP   Document 1   Filed 07/29/21   Page 23 of 59

# Exhibit A

**NYC** **Commission on Human Rights**

| Date | Intake # |
|------|----------|

# INTAKE FORM

## Your Information

| Name | | Preferred Title (e.g. Dr., Ms., Mx) | Date of Birth |
|------|---|---|---|
| David Chiu | | Mr. | 09/11/1981 |

| Address | 18 Hillcrest Road | | |
|---|---|---|---|

| City | Tenafly | State | NJ | Zip 07670 |
|------|---------|-------|----|----------|

| Cell Phone | 917-903-0980 | Other Phone | Occupation High End Sales Operations Sr Director |
|------------|--------------|-------------|------------|

| Email | david.g.chiu@gmail.com | Race/Ethnicity Asian | Primary Language English |
|-------|------------------------|---------------------|--------------------------|

Family Status: [X] Married   [ ] Domestic partner   [ ] Single   [ ] Other _____

Emergency Contact   My attorney, Tiffany Ma, Esq.: 212-971-9773

## Information About the Person or Entity that Took Action Against You

| Name | Dusan Vujovic | Company if any | Anheuser-Busch InBev SA/NV |
|------|---------------|----------------|----------------------------|

| Address | 125 W. 24th St. | | | |
|---------|----------------|---|---|---|

| City | New York | State NY | Zip | 10011 | Phone (347) 429-1082 |
|------|----------|----------|-----|-------|----------------------|

| Second Contact | | | | |
|----------------|---|---|---|---|

| Address | | | | |
|---------|---|---|---|---|

| City | State | Zip | Phone |
|------|-------|-----|-------|

| Date of most recent incident of discrimination: 11/5/20 | Borough where incident occurred: Manhattan |
|---|---|

Have you filed any complaint about this incident in any other place? [ ] Yes  [X] No

If yes, check the place or describe below:
[ ] EEOC   [ ] NY State Division of Human Rights   [ ] HUD   [ ] HPD   [ ] NYCHA   [ ] Court
[ ] Other: _____

| **My inquiry has to do with:** (check one, and then fill out the next section depending on your answer) | **Have you ever had an appointment with the Commission before?** [ ] Yes  [X] No |
|---|---|
| [ ] **Housing** (Complete Section A and D) [ ] **Public Accommodation** (store, restaurant, taxi, dentist office, etc.) (Complete Section B and D) [X] **Employment** (Complete Section C and D) [ ] **Discriminatory Harassment** (Complete Section D) [ ] **Bias-based Profiling by Law Enforcement** (Complete Section D) | List when, and the result of your inquiry: _____ _____ _____ _____ |

## SECTION A: Housing (fill out only if your inquiry involves housing)

Type of Housing:
[ ] Co-op           [ ] Commercial       [ ] Rental    [ ] Shelter
[ ] SRO             [ ] Owner-occupied   [ ] Condo     Approx. Number of Units _____

Basis of Discrimination -- Check all that apply:
[ ] Race            [ ] Color            [ ] Presence of Children    [ ] Marital Status
[ ] Gender          [ ] Gender Identity  [ ] National Origin         [ ] Sexual Orientation
[ ] Religion/Creed  [ ] Occupation       [ ] Lawful Source of Income [ ] Alienage/Citizenship Status
[ ] Age             [ ] Disability/Failure to Accommodate

**NYC** Commission on Human Rights

## SECTION B: Public Accommodation (fill out only if your inquiry involves a public accommodation)

**Basis of Discrimination -- Check all that apply:**

- [ ] Race
- [ ] Age
- [ ] Religion/Creed
- [ ] National Origin
- [ ] Sexual Orientation
- [ ] Color
- [ ] Gender
- [ ] Gender Identity
- [ ] Marital Status
- [ ] Alienage/Citizenship Status
- [ ] Disability/Failure to Accommodate

## SECTION C: Employment (fill out only if your inquiry involves employment)

How many employees does your employer have? [ ] More than 4   [X] More than 15

Are you in a union? [ ] Yes  [X] No   Which union? _____

**Basis of Discrimination -- Check all that apply:**

- [X] Race
- [ ] Color
- [ ] Sexual Orientation
- [ ] Alienage/Citizenship Status
- [ ] Gender
- [ ] Gender Identity
- [ ] Credit History
- [X] Disability/Failure to Accommodate
- [ ] Pregnancy
- [ ] Marital Status
- [X] National Origin
- [ ] Arrest/Conviction Record
- [ ] Age
- [ ] Religion/Creed
- [ ] Unemployment Status
- [ ] Status as victim of domestic violence, sexual violence, or stalking

## SECTION D: Explain

Briefly describe what happened:
Please see verified complaint enclosed

---

## OFFICE USE ONLY*****OFFICE USE ONLY *****OFFICE USE ONLY

| Date of Intake | Intake Number |
|---|---|

Attorney Assigned

1. Statute of Limitations deadline: LEB _____   EEOC _____

2. How did this person hear about the Commission? (check all that apply)

- [ ] CRB
- [ ] Social Services
- [ ] City Agency
- [ ] Internet
- [ ] Elected Official
- [ ] Community Org.
- [ ] Commissioner
- [ ] CCHR Website
- [ ] 311
- [ ] Private Lawyer
- [ ] Social Media
- [ ] Legal Services Org.
- [ ] Press
- [ ] TV
- [ ] Radio
- [ ] Newspaper
- [ ] Email
- [ ] Flyer/Brochure
- [ ] Taxi TV
- [ ] Other Complainant
- [ ] Advertisement (Please specify if possible)

**Details:** (If Elected Official, City Agency, Commissioner, or Other, write in the name/more information)

3. Language Access Issues:

a. Limited English Proficient? [ ] Yes  [ ] No

b. Primary Language of Complainant: _____

c. In which language was intake conducted? _____

d. Method of interpretation: [ ] LEB staff  [ ] Phone  [ ] Volunteer  [ ] Paid Interpreter

4. Were referrals made? [ ] Yes  [ ] No   Where? _____

5. Was a complaint filed? [ ] Yes  [ ] No

Approved by

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

------------------------------------------------------------------X

In the Matter of the Complaint of:        )
David Chiu,                               )
                                          )
                    Complainant,          )        **VERIFIED COMPLAINT**
                                          )
            -against-                     )
                                          )
Anheuser-Busch InBev SA/NV and Dusan Vujovic, )    **Case No.**
                                          )
                    Respondents.          )

------------------------------------------------------------------X

STATE OF NEW JERSEY        )
                           :ss:
COUNTY OF BERGEN           )


David Chiu, being duly sworn, deposes and says:

1. I, David Chiu ("David"), am the Complainant in this matter and I submit this Affidavit in support of my Charge. I believe that respondents Anheuser-Busch InBev SA/NV ("AB" or the "Company") and Dusan Vujovic ("Dusan") discriminated against me based on my race, parental/paternity status, and gender, failed to accommodate me, and retaliated against me by terminating me shortly after I returned from an already cut short protected paternity leave.

2. My address is 18 Hillcrest Road, Tenafly, NJ 07670. I reside at this address currently and also during my employment with Respondents. My attorney assisted me with the preparation of this Verified Complaint. My attorney is Tiffany Ma, Esq., Young & Ma LLP, 575 Lexington Avenue, 4th Floor, New York, New York 10022. Tel: 212-971-9773, Fax: 212-600-2301.

3. Anheuser-Busch InBev SA/NV's wholly-owned subsidiary, Anheuser-Busch Commercial Strategy, LLC (a foreign corporation domiciled in Delaware), has a New York address at 125 West 24th Street, New York, NY 10011. AB has a sizable employee population in New York City (over 200 employees), where I reported to work.

4. Respondent Dusan Vujovic is employed at AB as President, High End, and is in New York to supervise and direct employees.

5. I have not filed any other civil or administrative action concerning the unlawful discriminatory and retaliatory practices that are the subject of this Verified Complaint.

### Background

6. Anheuser-Busch InBev SA/NV is a multinational drink and brewing company based in Leuven, Belgium. With a market cap of $100+ billion and annual revenue around $50 billion, AB has approximately 400 beverage brands and about 170,000 employees.

7. I have a degree from Macalester College and an MBA from China Europe International Business School, during which time I interned twice for the Company.

8. I had a 10 year successful career at AB. I worked in six different positions, starting as a National Route-To-Market Manager in Sichuan/Chongqing China. Then I became a Route-to-Market Associate Director (Beijing/Tianjin/Hebei/Shandong/Inner Mongolia), National Retailer Associate Director (Shanghai, China), and then transitioned to New York in March 2016 as a High End National Wholesaler Development Director.

9. I was a Zone People Bet in 2014 and 2015. Next, I became a Senior Sales Director Specialty Brands/Region 7 in CA, and then National High End Sales Operations Senior Director in New York again from September 2018 to the end of my employment in November 2020. My accomplishments as a Senior Sales Director included overseeing the integration of newly acquired craft partners with the field sales organization and distributor network; leading a team of 14 High End District Managers and 17 High End Sales Rep; chairing the High End wholesaler advisory panel which kicked off in 2016 and is ongoing; and delivering $215M revenue in 2017.

10. I have been an incredibly loyal soldier for the Company and was shocked at the growing discrimination I experienced towards the end of my employment after I became a father. I would have been able to perform the essential functions of my job with accommodation and it would not have been an undue burden to the Company. AB also paid more to and expected less of lesser experienced, lesser tenured, and lesser performing White employees and/or employees without children or limiting circumstances.

### Race/National Origin and Primary Caregiver Discrimination, Failure to Accommodate, and Retaliation (including FMLA and NY Paid Sick Leave Law retaliation)

11. Although working in China at the start of my career presented an opportunity, it also stereotyped me when I returned to work in the U.S., even though I was raised an Asian American that went to China to work. Essentially, it was assumed that federal, state, and city employment laws did not equally apply to me in the Company because I had lateralled over from China.

12. When I met Dusan Vujovic ("Dusan") in 2011, he was initially very supportive of me. Both he and I were single men at the time. We both had no need for child/family related accommodations and worked all the time. When we came to New York together, I was instrumental to Dusan's integration, since I was an Asian American who actually grew up in New York since birth. Eventually, Dusan convinced me that I had to transition to California to be promoted to partner and would be Dusan's "eyes on the ground". Given this directive, I agreed to live separate from my wife to accommodate the Company and Dusan out of loyalty. Unfortunately, when I arrived in California, I faced immediate discrimination under Marcelo "Mika" Michaelis. Additionally, I was the second Asian employee (after Ashray Urs) sent by the Company to California that was not respected. Eight out of the 11 reporting to Mika were White Americans. Mika would confuse two Asian male employees, John Li and Martin Kang, as the same person.

13. Nevertheless, I rolled with the punches and still delivered 77.7% KPI achievement in 2018. The White comparator employees, Madeline Bury and Jonathan Samorajski, were treated better than me despite inferior performance and less experience, and were able to transfer into other roles. These two employees made Senior Director with just 4-5 years' work out of college in their 20s. It took me and other minority employees much longer.

14. When I returned to New York in September 2018, my department with Dusan had integrated many more White/European male employees such as Nate Muszczysnki, John Crerand, and Michael Higgins. Because I took the fall for Dusan to go to California, I was also returning with negative performance evaluations from Mika. I became more the butt of jokes. KPIs became harder to achieve because Dusan provided me with little to no resources or employees to support me. Nonetheless, I continued to perform at 95% satisfaction with High End wholesalers in 2019. In the summer of 2020, the position of High End 2.0 was given to another male employee, Rodrigo, who has no kids. As detailed below, I completely lost the support of Dusan after I decided to expand my family and have a child.

15. More and more meetings, such as routine meetings with Logistics, seemed to be attended only by White male employees. The wholesalers and field sales employees were complaining to me that they wanted visibility. The communications with wholesalers were strained due to the discrimination against me. The men in the group primarily either had no children or else had no caretaking responsibilities because their wives stayed home or had less demanding careers.

16. I had gotten married in 2014 and my wife works in management consulting, which is demanding in hours and responsibility. Because my wife and I needed the stability of her income, we agreed that I would have to stay in New York if we had kids. It would be financially detrimental to us to move anywhere else, and there was just no other way for

me to start a family with the unfairly low compensation and continuous lack of promotions I was experiencing at AB.

17. On my October 2019 review, Dusan suggested that for my next role I go to Bob Tallett's team in Business & Wholesaler Development, which was another all White team. In December 2019, I told Dusan that my wife was pregnant. In March 2020, at the beginning of the coronavirus pandemic, the team took a company trip to Las Vegas. Four out of six employees got COVID-19 on this trip. Again, there was no reason to include so many of the employees except to share my credit in wholesaler management while I did all the work and took all the risks not favorable to my pregnant wife. This was highly stressful to both me and my wife. The trip was to meet with a local Non-Equity wholesaler, Breakthru Beverage; only John Crerand and I needed to go. Others colleagues joined just to be provided with visibility, although I was never included in the other initiatives that I did not work on.

18. In April 2020, I was approved for 12 weeks of FMLA leave. I simultaneously spoke to Dusan about potentially moving to a Global HQ position, because those roles allow employees to be based in New York with limited global travel. It was for the ZX Ventures-Global RTM Non-Alcohol Senior Director position, which was later removed due to COVID-19. When I spoke to Dusan about the possible transfer, I explicitly mentioned that the lack of diversity on my current team and my need for less travel for primary caregiving duties as reasons justifying the transfer. It was clear from Dusan's reaction that he was extremely unhappy that I had raised the issues of diversity and need for a caregiver accommodation While Dusan superficially later agreed that I would not have to move for a year to placate me, he was simultaneously deciding my long career would be over. Dusan saw this request and my later paternity leave as a betrayal, when in fact I was engaging in self-help concerning a need for reasonable accommodation because I was going to be a new father, and needed to be present as the primary caregiver with a breadwinning wife.

19. On May 14-15, 2020, I was told by Dusan that my performance was fine.

20. On May 18, 2020, a colleague told me that we were safe in our role for the remainder of the year and would not need to relocate (because the Company had an informal policy requiring relocation, which is why I had considered the Global HQ position back in April). Dusan confirmed this two days later.

21. On May 19, 2020, I received another Metlife approval for FMLA leave to start on June 26, 2020.

22. On June 3, 2020, I had a very vocal discussion with Dusan and his direct reports on diversity and inclusion, given progress made in the BLM movement. I indicated specifically that a national town hall discussion was disingenuous without more

minorities in the company, and specifically in management roles. I further asserted that the demographics of management do not reflect the beer consumer demographics, which was causing the Company to send the wrong message in marketing, advertising, communication, and business strategy. Rodrigo, Martin, Nate, and John were all present during these conversations. I mentioned that Bob Tallett's team (Business and Wholesaler Development) is 100% Caucasian. Dusan even admitted that all Brazilians in the company are light skinned, even if over half of the actual Brazilian population is of Afro-Brazilian heritage and dark skinned. In summer 2020, Asian Americans in the United States were also experiencing an unprecedented number of hate crimes and physical and verbal assaults in the streets.[1] Yet both the Company and Dusan never addressed this at all in team meetings or to me directly. They also completely ignored the fact that the negative perception of Asian Americans was leading to a disproportionate amount of wrongful terminations causing unemployment rates for Asian Americans to soar in NYC and around the country.

23. On June 25, 2020, my son was born.

24. While I was on approved FMLA leave/parental leave on July 1, 2020, Dusan asked whether I would be joining an "optional" meeting, and I said that I was exhausted having been a father for just a week. Dusan then sent a coworker to berate me for missing this optional meeting, which it appeared Dusan was now claiming to have been mandatory. After this, I returned early to work after just two weeks of leave, since it was clear I was going to be retaliated against for exercising my right to take parental leave. I was also assisting my wife during this time, who had post partum depression because of birth by suction, and tending to see if my baby suffered any physical trauma. Therefore, I was not merely bonding with my new baby but also taking care of my wife and baby's medical needs. I experienced both FMLA retaliation and NYC Paid Sick Leave Law retaliation.

25. I was the primary caregiver and yet I was pressured to return early because, due to the culture fostered by Dusan, none of the other men took more than 2 weeks off when their wives gave birth, as their wives were not employed or not working full time when their kids were young or just born. In August 2020, Dusan assigned Kirin Sales (a Japanese brand) to Martin Kang, another Asian male (Korean). The perception was that my career was over when I had a child. However, I am the one that speaks Japanese and had field experience, whereas Martin came from finance and focused on strategy, PowerPoints, and analytics but had no field experience (and additionally Martin had voiced many times his distaste for Japanese restaurants, which are the main carriers of Kirin products).

---

[1] Asian American Bar Association of New York and Paul, Weiss, Rifkind, Wharton & Garrison LLP, A Rising Tide of Hate and Violence against Asian Americans in New York During COVID-19: Impact, Causes, Solutions, https://www.aabany.org/resource/resmgr/press_releases/2021/A_Rising_Tide_of_Hate_and_Vi.pdf (last visited March 2, 2021).

26. On August 18, 2020, Dusan started blaming me aggressively on texts for things I was never blamed for before I became a father. In fact, before I had a child, Dusan had said my performance is fine and my job was secure.

27. On September 2, 2020, Dusan said he "heard" from other team members that I was not planning on going into the office for as long as possible due to my newborn (which was false). Meanwhile, one of the preferred White male employees, Nate, had already moved back to Chicago, and there were no jokes about him even though he did not return in September. After this, I reported into the office 1-2 times a week until I was terminated. Nevertheless, after all these efforts, Dusan still said I was not as busy as I should be (all within 3 months of my becoming a new father).

28. When I was terminated in November 2020, no one else in the direct group under Dusan was terminated. My work was given to Rodrigo, who had no children. Over the years, there were few or no minorities (and no primary caregiver male minorities) elevated to senior management. Chris Han, another Asian American male who had excellent sales volume performance and even received additional RSUs in early 2020, was terminated shortly after me earlier this year and yet was also cited for poor performance as a reason for termination.

29. The company offered me an amount of severance that was less than the remainder of what I would have been entitled to under paid parental leave had I not been unlawfully pressured to return early. The Company has a policy of 16 weeks of paid parental leave of which I only took 2 weeks. Therefore I found it most insulting that after 10 years of employment and after experiencing egregious discrimination and retaliation, I was not even offered the remaining 14 weeks of a paid parental leave policy which I obviously could not enjoy due to the discrimination and retaliation I experienced during my employment (and even after I was approved for FMLA).

30. My attorney reported all of these things directly to the Company on March 3, 2021.

31. Having raised these issues with the Company through my attorney, AB is now seeking to compel arbitration of all of my claims, and preemptively filed a demand for arbitration with the AAA in order to (i) deprive me of my right to file administrative charges, and (ii) avoid investigation and scrutiny by the NYC Commission on Human Rights and other authorities. I find it highly problematic that the Company has a mandatory arbitration policy that allows it to quickly commence an arbitration as soon as the employee notifies them of a potential claim and mediation "fails". And, even though the Commission and other FEP agencies are clearly not bound by any arbitration agreement, the Company's arbitration policy even indicates the Company can ask administrative agencies to adjourn their investigation, which I believe greatly hinders the work and legal authority of the NYC Commission on Human Rights, NYS Division of Human Rights, NYC Department

of Consumer Affairs, and U.S. Equal Employment Opportunity Commission, which are tasked with investigating and prosecuting these egregious practices. The policy has successfully been used to prevent these agencies (and especially the NY fair employment agencies) from being able to discover and remediate these obvious violations of NY law by AB and its affiliates.

32. The arbitration policy also allows the Company to circumvent an employee's Title VII rights by filing early arbitration. Title VII requires administrative exhaustion before being allowed to bring a claim, and Respondents are preventing me from filing a Title VII charge by preemptively "commencing" a AAA arbitration, with Respondents' Answer now due on July 8, 2021, before I have had a chance to formalize my facts and causes of action.

33. The Company's brazen attempts to deprive employees and agencies of their statutory right to administrative investigation and remediation, and to shield itself from government scrutiny, should also be thoroughly investigated by the Commission and other authorities.

34. I seek an award of back pay, front pay and all other benefits, compensatory and punitive damages, emotional distress damages, attorney's fees and costs and/or an order directing Anheuser-Busch InBev SA/NV and Dusan Vujovic to cease and desist from their discriminatory, harassment and retaliatory practices, together with any further and additional relief that is just and proper.

35. I provide the foregoing information to assert my rights under Title VII of the Civil Rights Act, as amended; Americans with Disabilities Act; New York State Human Rights Law; and New York City Human Rights Law to invoke the jurisdiction of the New York City Commission on Human Rights ("NYCCHR") to investigate this charge and proceed in accordance with its statutory mandate and procedural regulations and to satisfy all procedural prerequisites to the commencement of a civil action in the event that the charge is not resolved by conciliation, conference and persuasion. Nothing in this charge is intended to constitute a waiver of any right to seek judicial relief under state or local law with respect to the conduct complained of herein.

36. I will advise NYCCHR of any change in my address or phone number and I will cooperate in the proper processing of and investigation into this charge.

37. The facts and evidence concerning discrimination, harassment and retaliation at Anheuser-Busch InBev SA/NV are not limited to those described in this affidavit.

38. The Company is fully aware of the actions, harassment and discriminatory and retaliatory motives of its management and employees. I have reported it to the Company directly and through counsel but the Company either ignores the complaints or otherwise makes no effort to change the hostile work environment or make me whole although they have the ability to do so.

David Chiu

Sworn to before me this
_____1ˢᵗ th_ day of July, 2021

Notary Public

**SHREYAS S SHAH**
ID # 2218019
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires Sept. 22, 2023

Case 1:21-cv-06460-LAP   Document 1   Filed 07/29/21   Page 34 of 59

# Exhibit B

# Dispute Resolution Program Policy





# SPECIAL NOTICE TO EMPLOYEES

## THIS POLICY CONSTITUTES A BINDING AGREEMENT BETWEEN YOU AND THE COMPANY FOR THE RESOLUTION OF EMPLOYMENT DISPUTES

By continuing your employment with Anheuser-Busch Companies, Inc. or any of its subsidiary companies ("Company"), you and the Company are agreeing as a condition of your employment to submit all covered claims to the Anheuser-Busch Dispute Resolution Program ("DRP"), to waive all rights to a trial before a jury on such claims, and to accept an arbitrator's decision as the final, binding and exclusive determination of all covered claims.

This program does not change the employment-at-will relationship between you and the Company.



THIS DOCUMENT SUPERSEDES PRIOR VERSION OF THE DRP POLICY STATEMENT AND PROGRAM GUIDE AND IS EFFECTIVE FOR CLAIMS FILED ON OR AFTER APRIL 1, 2004.

*Printed copies may not be up-to-date.  Contact the DRP Administrator for the most current version.  In the event of any conflict, the English language of this Agreement shall control.*

# GENERAL RULES

## COVERED EMPLOYEES

The DRP applies to all salaried and non-union hourly employees of Anheuser-Busch Companies, Inc., or any of its U.S. subsidiaries ("Employee").

## OVERVIEW

Employees are encouraged to resolve work-related disputes informally through dialogue with their managers, a Human Resources (HR) representative, or the Anheuser-Busch Personnel Communications department.  However, when informal efforts do not resolve an Employee's dispute, and the Employee wishes to pursue the matter further, an Employee must submit his or her dispute to the DRP.

DRP is a structured dispute-resolution process that consists of:  Level 1 - Local Management Review; Level 2 - Mediation (if the dispute is a covered claim); and Level 3 - Binding Arbitration (if the dispute is a covered claim).  Employees must complete each level of the process before proceeding to the next level.

At Level 1 - Local Management Review, an Employee and the management team attempt to resolve the Employee's dispute locally.  Given the diverse structure and culture of each Anheuser-Busch subsidiary, Level 1 procedures have been implemented to suit each subsidiary's particular needs.

If an Employee is not satisfied with the outcome of Level 1 and wishes to pursue his or her covered claim(s) further, the Employee must submit the claim to Level 2 - Mediation. At Level 2, an independent mediator helps the Employee and the Company open lines of communication in an attempt to facilitate a resolution.  If an Employee and the Company do not reach a resolution at Level 2, an Employee who wishes to pursue the covered claim(s) further must submit the covered claim(s) to Level 3 - Binding Arbitration.

At the Binding Arbitration level, an independent arbitrator provides the Employee and the Company with a ruling on the merits of the Employee's covered claim(s).  The arbitrator's decision is the final, binding and exclusive remedy for the Employee's covered claim(s) and is equally final and binding upon the Company.

The Company and the Employee will jointly select a mediator and, if necessary, an arbitrator, from a panel provided by an organization of professional mediators and arbitrators, such as the American Arbitration Association ("Association").

## Duration and Modification

This program constitutes the sole agreement between the Company and its Employees concerning the requirements of the DRP and may not be modified by written or oral statements of any Company representative, except by publication under the authority of the Anheuser-Busch Companies, Inc. Vice President - Human Resources.  If there are conflicts between the

requirements of the DRP and other Company publications or statements by Company representatives, the requirements of the DRP are controlling. The Company may, at its sole discretion, modify or discontinue the DRP at any time by giving Employees 30 calendar days' notice. Both the Company and the Employee shall complete the processing of any dispute pending in DRP at the time of an announced change under the terms of the procedure as it existed when the dispute was initially submitted to the DRP.

## Filing Charges with Government Agencies

Nothing in this program is intended to discourage or interfere with the legally protected rights of Employees to file administrative claims or charges with government agencies. Such agencies include, but are not limited to, the Equal Employment Opportunity Commission (EEOC), the Office of Federal Contract Compliance Programs (OFCCP), and related state fair-employment agencies.

However, if an Employee files a charge with the EEOC, OFCCP, or with a state fair-employment agency, the Company may request the agency to defer its processing of the charge until the Employee and the Company complete the DRP.

## Business Ethics and Conflicts of Interests

This program does not replace the Business Practices and Ethics Policy or the Company's Conflict of Interest Policy. Employees have a continuing responsibility to report violations of these policies to the Anheuser-Busch Companies, Inc. Vice President and Corporate Secretary's office.

## DRP Administrator

The DRP Administrator, or his or her designee, will:

1.   Coordinate the receipt of Employee disputes with managers and with HR representatives;

2.   Answer questions about the DRP;

3.   Monitor compliance with and requests for extensions of all time limits for submission of claims;

4.   Coordinate the scheduling of mediation and arbitration hearings at Levels 2 and 3;

5.   Schedule training sessions for Employees and managers;

6.   Schedule the Company's participation in pre-arbitration communications with arbitrators and Employees regarding specific discovery issues;

7.   Work with Company representatives, Employees, and their attorneys, to select and schedule mediators and arbitrators;

8.   Administer and interpret the terms and conditions of the DRP including, but not limited to, the determination of whether or not an Employee's claim is a covered claim. The Administrator's determination shall be final and binding on the Company and Employees and not subject to further review under the DRP;

9.     Function as the Company's administrative liaison with the Association; and

10.     Attend mediations and arbitration hearings.

## Personnel Communications Department

The Personnel Communications department functions as a designated neutral in disputes between Employees and the Company.  This department can provide information to Employees about the Company's policies, practices and procedures, including the DRP.  The Personnel Communications department is an informal resource for both management and Employees and does not participate in formal DRP problem-solving proceedings.  However, Employees and managers may consult with Personnel Communications staff during any part of the process.



## COVERED CLAIMS

While Employees may submit any employment-related dispute at Level 1, only covered claims will be accepted and processed at Levels 2 and 3.  Covered claims are claims relating to or arising out of the employment relationship that:

A.  the Company may have against an Employee, and/or

B.  the Employee may have against the Company and/or any individual employee who is acting within the scope of his or her employment with the Company, where the Employee alleges unlawful termination and/or unlawful or illegal conduct on the part of the Company including, but not limited to, the following:

(1)  Claims relating to involuntary terminations, such as layoffs and discharges (including constructive discharges) when those terminations are alleged to be discriminatory or otherwise unlawful under applicable federal or state law;

(2)  Employment discrimination and harassment claims based on, for example, age, race, sex, religion, national origin, veteran status, citizenship, disability, or other characteristics protected by applicable laws;

(3)  Retaliation claims for legally protected activity, and/or for whistle-blowing under federal or state law;

(4)  Claims relating to workplace accommodation due to physical or mental disabilities;

(5)  Claims of breach of a fiduciary duty to the Company or of breach of a duty of loyalty;

(6)  Claims of breach of an employment contract or covenant (express or implied) and/or promissory estoppel;

(7)  Tort claims, such as negligence, defamation, invasion of privacy, and infliction of emotional distress; and

(8)  Claims of violation of public policy.

## EXCLUDED CLAIMS

The following claims shall be excluded from DRP:

A.  Claims for benefits under a Company benefit plan covered by the Employment Retirement Income Security Act of 1974 (ERISA), or any other claims covered by ERISA;

B.  Claims for workers' compensation, unemployment compensation benefits and violations of specific safety requirements;

C.  Claims involving patents, trademarks, or  intellectual property or trade secrets;

D.  Claims covered under the National Labor Relations Act;

E.  Claims against an individual employee that do not involve conduct within the scope of the employee's employment; and

F.  Claims that seek to establish, modify or object to the Company's policies or procedures, except claims alleging discriminatory application of such policies.

## Time Limitations

In order to submit covered claims to Level 2 of the DRP, the dispute must have been submitted to Level 1 within 180 days of the date the dispute arose or before the expiration of the statute of limitations applicable to the alleged unlawful conduct or violation of law, whichever is longer.

The failure to submit a claim to Level 1 within the time limits set forth in this paragraph shall be deemed a waiver and release of that claim, unless the right to pursue a statutory claim or remedy is expressly preserved by law.

The Company's failure to reject a covered claim that an Employee has submitted to Level 1 of the DRP after the expiration of the applicable time limitations shall not waive the Company's right to assert the untimeliness of a covered claim as a defense at a later time.

## Agreement to Arbitrate in Interstate Commerce

This program constitutes a written agreement to arbitrate pursuant to the Federal Arbitration Act, 9 U.S.C. A. Sections 1-14. The parties acknowledge that the Company is engaged in transactions involving interstate commerce and Employees eligible to participate in the DRP are not employed by the Company as seamen, railroad employees, or other class of worker engaged in foreign or interstate commerce.

Resolution of any covered claim pursuant to the DRP is intended to be final and binding on the Company and the Employee to the fullest extent permitted by law.

## Effect of Court Decision

If a court of competent jurisdiction determines that the DRP is not the exclusive, final and binding method for the Company and its Employees to resolve disputes, and/or that the decision and award of the arbitrator is not final and binding as to some or all of the claim(s) in dispute, the Company and the Employee agree that they will first use the DRP for any covered claims before filing or pursuing any legal, equitable, administrative or other formal proceeding. If a court determines that any provision of the DRP is invalid or unenforceable, the validity, legality and enforceability of the remaining provisions shall not be affected by the determination and each remaining provision of the DRP shall be valid, legal and enforceable to the fullest extent permitted by law.

## Retaliation Is Prohibited

All Company Employees are prohibited from retaliating against anyone who submits a dispute to the DRP, or who participates as a witness or otherwise in the DRP process.

# PROCEDURAL RULES FOR LEVEL 1 LOCAL MANAGEMENT REVIEW

Level 1 problem-solving procedures vary according to the needs of the individual subsidiary or business unit.  Therefore, each business unit has implemented its own procedures for Local Management Review.  However, the following minimal requirements will apply:

## Article One:  Submission of Disputes

1.1　Using the DRP Notice of Dispute form, the Employee shall submit the dispute to the local Human Resources department or designated HR manager for that department or facility.

(a)　The Employee should provide a detailed account of his/her claim(s), the individuals involved, and a desired outcome.

(b)　The Employee may retain a copy of the completed document and keep a record of the date and names of the individuals to whom the document is submitted.

1.2　The local HR manager is responsible for immediately forwarding a copy of the form to the DRP Administrator.

## Article Two:  Time Limitations for Submission of Claims

2.1　There are no time limits for an Employee's submission of disputes at Level 1; however, if the Employee intends to submit a covered claim to Levels 2 or 3, he or she must submit the dispute to Level 1 within the applicable time limitation.  (See Time Limitations in Part One General Rules.)

# PROCEDURAL RULES FOR LEVEL 2 MEDIATION

## (COVERED CLAIMS ONLY)

Only covered claims shall be processed at Level 2 (Mediation). Covered claims shall not be processed at Level 2 unless the Employee submitted such claims to Level 1 before the expiration of applicable time limitations.

## Article One: Description

1.1   Mediation is a process that seeks to find common ground for the voluntary settlement of covered claims. Mediation involves an attempt by the parties to resolve their disputes with the aid of a neutral third party not employed by the Company. The mediator's role is advisory. The mediator may offer suggestions and question the parties, but resolution of the dispute rests with the parties themselves. The mediator cannot force either party to settle the dispute. Proceedings at the Mediation level are confidential and private.

1.2   The mediator may meet with the parties jointly or separately in order to facilitate settlement. The mediator normally gives each party an opportunity to explain the dispute, including the reasons that support each party's position.

## Article Two: Submission of Request for Mediation and Time Limits

2.1   In order to begin the mediation process, the Anheuser-Busch Request for Mediation form along with the required $50 fee must be submitted to the DRP Administrator.

2.2   Request for Mediation must be received by the DRP Administrator or postmarked within 30 calendar days of the date of the Company's final determination at Level 1.

2.3   The Request for Mediation shall contain a brief description of the nature of the covered claim(s) and the name of the Employee requesting mediation and his or her attorney, if any.

2.4   Upon receipt of the Request for Mediation, the DRP Administrator will review the claim(s) and then determine if any claim is not eligible for the DRP process because it does not involve a covered claim or because it was submitted outside the applicable time limitations.

2.5   The DRP Administrator's determination of which claims are eligible for the DRP process shall be final and binding on the Company and the Employee and not subject to further review under the DRP.

## Article Three:  Selection of a Mediator

3.1   If a claim upon which Request for Mediation is based is eligible for the DRP, the Employee and the Company will select a mediator by mutual agreement.  If the Employee and the Company cannot agree to the selection of a mediator, the DRP Administrator will request that the Association appoint a mediator in accordance with its procedures. Prior to selection, mediator candidates shall disclose potential conflicts of interest.

## Article Four:  Qualifications of Mediators

4.1   The mediator should typically have a minimum of five years' experience in the practice of employment law or in the mediation of employment claims or comparable experience. In addition, the mediator shall not have any direct financial or personal interest in the outcome of the mediation.

## Article Five:  Date, Time and Place of Mediation

5.1   After the mediator is selected, the parties shall agree on a date, time and place for the mediation.  However, if the parties fail to agree, the mediator shall schedule the mediation on a normal business day during normal business hours.  Unless the parties agree otherwise, the mediation shall take place within 25 miles of the work location where the dispute arose.  In the event that the mediation takes place more than 25 miles from the Employee's current work location, the DRP Administrator shall have the discretion to pay the Employee's reasonable travel expenses.

## Article Six:  Length of Mediation

6.1   Mediations typically take a full day, but can be extended if needed. Either of the parties or the mediator may end the mediation at any point.

## Article Seven:  Summary of Disputed Issues

7.1   Prior to the scheduled mediation, each party may provide the mediator with a brief written summary of the dispute setting forth the party's position concerning all claims.

## Article Eight:  Attendees at Mediation

8.1   Either party may be assisted or represented by an attorney.  If the Employee does not have an attorney present at the mediation, the Company will not have an attorney present at the mediation.  The Employee must notify the Company 14 days prior to the mediation whether he or she will have an attorney present.

8.2   The mediation shall be a private and confidential meeting of the parties and the mediator. Without the agreement of both parties, no one may attend the mediation except the mediator, the Employee, his or her spouse and attorney, Company representatives and the Company attorney.

## Article Nine:  Confidentiality

9.1   The entire mediation process is confidential, except for the fact that the process has taken place.  Unless otherwise agreed among the parties or required by law, the parties and the mediator shall not disclose to any person who is not associated with the mediation process, any information regarding the mediation process, settlement terms, or outcome of the proceedings, except the settlement terms may be disclosed in an action to enforce compliance with the terms of any settlement.

9.2   The mediator and any documents and information in the mediator's possession will not be subpoenaed in any investigation, action or proceeding, and all parties will oppose any effort to have the mediator or documents subpoenaed.  The mediator will promptly advise the parties of any attempt to compel him or her to divulge information received in mediation.

9.3   Neither the Employee, the Company, nor anyone else may make a formal record or transcript, or use any electronic recording device at the mediation.  However, any attendee may make handwritten notes during the mediation.

## Article Ten:  Costs and Fees

10.1   The Company will pay:

    (a)   any filing and other administrative fees required by the Association;

    (b)   the mediator's fee and reasonable travel expenses;

    (c)   the cost of renting mediation rooms; and

    (d)   the Employee's salary or wages (if still employed by the Company) for the time spent at the mediation.

## Article Eleven:  Notice of Unsuccessful Mediation

11.1   If the parties are unable to resolve the dispute at mediation, the DRP Administrator will provide the Employee with a written notice that mediation has been unsuccessful and inform the Employee of his or her right to proceed to Binding Arbitration by giving the Employee a Notice of Unsuccessful Mediation.

Case 1:21-cv-06460-LAP   Document 1   Filed 07/29/21   Page 46 of 59

# PROCEDURAL RULES FOR LEVEL 3 BINDING ARBITRATION
## (COVERED CLAIMS ONLY)

## Article One:  Description

Binding arbitration is a dispute-resolution process in which the Employee and the Company present their respective positions concerning their covered claim(s) to an impartial third-party arbitrator who determines the legal merits of the claim(s).  An arbitration hearing resembles a court proceeding in certain ways.

1.1    Both parties have the opportunity to be represented by an attorney, to make opening statements, to present the testimony of witnesses and introduce exhibits, to cross-examine the other party's witnesses, and to make closing statements.

1.2    Arbitration differs from mediation in that the arbitrator decides the merits of the claim(s) and issues a written decision, which is final and binding on both parties.

## Article Two:  Submission of Covered Claims to Binding Arbitration and Time Limits

2.1    In order to begin the arbitration process, the Employee must submit the Anheuser-Busch Request for Binding Arbitration form along with the required $125 fee to the DRP Administrator.

2.2    The Request for Binding Arbitration must be received by the DRP Administrator or post-marked within 30 days of the date of the Notice of Unsuccessful Mediation.

2.3    The Employee shall include in the Request for Binding Arbitration a brief but thorough description of the nature of the claim(s).  Upon receipt of the Employee's Request for Binding Arbitration form, the DRP Administrator shall initiate arbitration proceedings.

2.4    If the Request for Binding Arbitration includes claims not included in the Employee's original Notice of Dispute, the DRP Administrator shall determine if the Employee must file these new claims on a separate Notice of Dispute, or if they can be properly incorporated into the Employee's existing DRP claim.

2.5    The DRP Administrator's determination as to the handling of new claims shall be final and binding on the Company and the Employee, and not subject to further review under the DRP.

## Article Three:  Selection of Neutral Arbitrator

3.1    All covered claims will be decided by a single decision-maker (the "Arbitrator").

3.2    The DRP Administrator will request the Association to provide a list of qualified candidates.

3.3    The Company and the Employee will attempt to agree on the selection of the Arbitrator from the list provided by the Association.

3.4    Either party has the right to ask the DRP Administrator to request a list of additional candidates from the Association.

3.5    Prior to selection, Arbitrator candidates shall disclose potential conflicts of interest.

3.6    Either party shall have the right to interview Arbitrator candidates provided that the other party has been notified and is given the opportunity to participate.

3.7    If the Employee and the Company cannot agree on the selection of an Arbitrator:

(a)    the DRP Administrator will request that the Association appoint an Arbitrator in accordance with its procedures. The function of the Association shall be limited to assistance in the selection of an Arbitrator in accordance with this Article, and the Association's other rules regarding arbitration shall not otherwise apply; and

(b)    the Association's selection of an Arbitrator shall be subject to challenge for cause by either party if circumstances exist that raise justifiable doubts regarding the Arbitrator's independence or impartiality. If one party challenges the Association's selection, the other party may agree to the challenge or the Arbitrator may voluntarily withdraw. If neither occurs, the challenge shall be decided by the Association, whose decision shall be final and binding on both parties.

3.8    Once the arbitrator is selected, neither party shall communicate with the Arbitrator, either verbally or in writing, outside of the other party's presence or, in the case of written communication, without copying the other party on such written communication.

## Article Four: Qualifications of a Neutral Arbitrator

4.1    The Arbitrator shall be a licensed attorney with a minimum of five years' experience in the practice of employment law or in the arbitration of employment law claims or comparable experience. In addition, the Arbitrator shall not have any direct financial or personal interest in the outcome of the arbitration.

## Article Five: Date, Time and Place of Arbitration Hearing

5.1    The parties may agree on a date and time for the arbitration hearing. However, if the parties fail to agree, the Arbitrator shall set the time and date for the arbitration hearing.

5.2    Unless the parties agree otherwise, the arbitration hearing shall take place within 25 miles of the work location where the dispute arose.

5.3    If the arbitration location is more than 25 miles from Employee's current work location, the DRP Administer shall have the discretion to pay the Employee's reasonable travel expenses.

## Article Six:  Attendees at Arbitration Hearings

6.1    The Employee may be assisted or represented by an attorney at Level 3.  If the Employee is represented by an attorney at the arbitration hearing, the Company will also be represented by an attorney at the arbitration hearing.

6.2    Either party may present expert witness testimony to the Arbitrator.  Neither party may call more than 10 witnesses, including expert witnesses, unless both parties agree in advance or the Arbitrator grants the request of a party to increase the number for good cause shown.

6.3    The arbitration hearing shall be a private hearing.  Without the written agreement of both parties, no one may attend the arbitration hearing except the Arbitrator, an official recorder, if any, the Employee and his or her spouse, Company representatives, and attorneys, experts, and witnesses for the parties.

6.4    The Arbitrator may sequester witnesses during the hearing.

## Article Seven:  Discovery

7.1    Discovery is the process by which parties to a pending covered claim obtain certain non-privileged information in possession of the other party that is relevant to the proof or defense of the covered claim.

7.2    Discovery shall be conducted in the most expeditious and cost-effective manner practicable and shall be limited to that which is relevant and material to the covered claim(s) and for which each party has a substantial, demonstrable need.

7.3    Consistent with the expedited nature of arbitration, discovery is subject to certain limitations set forth below, including the requirement that the parties shall complete all discovery no later than 10 calendar days prior to the start of the arbitration hearing unless otherwise directed by the Arbitrator for good cause shown.

(a)    Depositions - Either party may depose all expert witnesses named by the other party and up to two other individuals.  All depositions shall be conducted under oath and transcribed by a certified court reporter.  The party noticing or requesting a deposition shall pay for the services of the court reporter and for the original of the transcript.  The other party may (at its own expense) purchase copies of the transcript from the court reporter.

(b)    Interrogatories - Either party may propound up to 10 interrogatories (including subparts) to the other party.

(c)    Production of Documents and Additional Discovery - Each party has the right to request the production of relevant documents at the cost of the requesting party, subject to the other party's right to object.  This procedure does not require either party to provide information to the other party that is proprietary, confidential, privileged, classified, or trade-secret information.

(d)  Discovery Disputes - The Arbitrator shall decide any discovery disputes concerning depositions, the production of relevant documents or other information. The party seeking discovery must bring the discovery dispute to the attention of the Arbitrator. Unless the parties agree otherwise, the party seeking discovery must arrange for a teleconference with the Arbitrator and the other party. The Arbitrator shall make a ruling on all discovery disputes, which shall be final and binding, no later than 10 calendar days before the date of the arbitration hearing.

(e)  Nothing in these discovery procedures shall be interpreted to require that either party disclose information protected from discovery by the attorney-client and/or work-product privileges. The Arbitrator shall have the authority to resolve any dispute as to whether any particular piece of requested discovery is protected from disclosure by the attorney-client and/or work-product privileges.

(f)  The Arbitrator may grant, upon good cause shown, either party's request for additional or alternative discovery above and beyond that which this Article Seven expressly provides.

7.4  Disclosure of Witnesses and Documents - At least 30 calendar days before the arbitration hearing, each party shall provide written notice to the other party of the names and addresses of all witnesses the party intends to call at the arbitration hearing, copies of all documents the parties intend to introduce, as well as the names and addresses of attorneys who will attend the hearing. The parties may supplement this information up to 20 calendar days prior to the hearing.

7.5  Protective Orders - The Arbitrator may issue protective orders in response to a request by either party. Such protective orders may include, but are not limited to, sealing the record of the arbitration hearing, in whole or in part, to protect the privacy, trade secrets, proprietary information, and/or other legal rights of the parties or the witnesses.

## Article Eight:  Recording the Arbitration Hearing

8.1  Either party may arrange for a certified court reporter to make a stenographic record and transcript of the arbitration hearing.

8.2  If only one party requests that a record be made, then that party shall pay for the entire cost of the record. If both parties want access to the record, the parties shall share the cost equally.

8.3  In the event access to the transcript is requested by one or both parties, an additional copy shall be provided to the Arbitrator at the expense of the requesting party or parties.

## Article Nine:  Subpoenas

9.1  Each party may request the Arbitrator to subpoena witnesses or documents for the arbitration hearing, pursuant to Section 7 of the Federal Arbitration Act, 9 U.S.C.A. Sections 1-14.

9.2  Unless the Arbitrator directs otherwise, the party requesting a subpoena for the production of documents or witnesses shall bear the cost of such production.

## Article Ten:  Evidence

10.1   The Arbitrator shall afford each party a full and fair opportunity to present any proof relevant and material to the covered claim(s), to call and cross-examine witnesses and to present argument.  However, the Arbitrator shall not receive or consider evidence by affidavit, or evidence submitted to the arbitrator after the arbitration hearing, unless the parties agree to the receipt of such evidence.

10.2   All testimony shall be under oath or affirmation.

10.3   The Arbitrator shall determine the weight and relevance to be afforded to such evidence.

10.4   The Arbitrator shall not be bound by formal rules governing the admissibility of evidence, except for the law applicable to attorney-client privilege, and attorney work-product.

10.5   The Arbitrator shall be the judge of the relevancy, materiality and admissibility of the evidence offered, and the Arbitrator's decision on any question of the admissibility of evidence shall be final and binding.

## Article Eleven:  Applicable Law and Burdens of Proof

11.1   Each party bears the burden of persuasion on any claim raised by that party in accordance with applicable federal or state law.

11.2   The Arbitrator shall follow the legal burdens of proof as required by the applicable federal or state law.  In all cases, including but not limited to, termination, the party requesting relief has the burden of proving that the action or decision at issue was illegal or unlawful under applicable law.

## Article Twelve:  Brief and Arbitrator's Opinion

12.1   Each party will have the opportunity, if desired, to submit a written brief to the Arbitrator within 30 calendar days of the close of the arbitration hearing or receipt of the arbitration transcript, whichever is later.

12.2   The parties waive the right to file a brief unless they notify the Arbitrator by the close of the arbitration hearing of their intention to do so.

12.3   The Arbitrator shall be responsible for forwarding a copy of the opposing brief to the other party.

12.4   The Arbitrator shall issue a written opinion to the parties not more than 30 calendar days after the close of the arbitration hearing, or 30 calendar days after the Arbitrator's receipt of the parties' briefs, whichever is later.

12.5   The opinion shall be signed by the Arbitrator and shall contain:

(a)   the names of the parties and their representatives;

(b)   the dates and place of the hearing;

(c)   a summary of the covered claims arbitrated and decided;

(d)   finding of fact and conclusions of law; and

(e)   the rationale for any grant of monetary or other relief.

## Article Thirteen:  Authority of the Arbitrator

13.1   The Arbitrator shall have exclusive authority to resolve any dispute relating to the applicability, enforceability or formation of the DRP, including any claim that all or part of the DRP is invalid or unenforceable.

13.2   The Arbitrator shall decide all covered claims in accordance with the substantive law of the state or the federal circuit, or both, in which the claim(s) arose.

13.3   The Arbitrator shall not diminish the Company's authority to establish, revise, interpret or administer its policies, procedures, rules and/or practices.

13.4   The Arbitrator shall have exclusive authority to determine if either party may amend existing claims or counterclaims or add new claims or counterclaims, and to grant such additional or alternative discovery as he or she deems appropriate.

## Article Fourteen:  Damages and Relief

14.1   The Arbitrator shall have the authority to decide at any stage in the arbitration a party's request to dismiss a claim in whole or in part.

14.2   Upon a finding that a party has sustained his or her burden of persuasion, the Arbitrator shall, except as provided by Article 13 (Authority of the Arbitrator) and Article 16 below (Front Pay Option Instead of Reimbursement), have the same power and authority  as a judge or a jury in a court trial to grant any relief available under applicable law in the relevant jurisdiction.

14.3   Both parties have a duty to mitigate their damages by all reasonable means.  The Arbitrator shall take into account in granting relief, pursuant to this Article 14 and Article 16, the extent of a party's mitigation or a party's failure to mitigate.

14.4   The exclusion of Company benefit plans covered by ERISA from the DRP precludes a claim alleging a violation of such plans.  However, in connection with making an award for a covered claim, the Arbitrator may consider the monetary value of lost Company benefits caused by an unlawful termination of employment or other violation of law.

## Article Fifteen:  Sanctions

15.1  The Arbitrator may sanction either party by awarding the other party its reasonable attorneys' fees and costs, including reasonable expenses associated with production of witnesses or proof, upon a finding that a claim was frivolous or brought to harass the Employee, the Employer or the Employer's personnel.

15.2  The Arbitrator may sanction either party by awarding the other party reasonable attorneys' fees and costs associated with production of witnesses or proof, upon a finding that the other party (a) engaged in unreasonable delay, (b) failed to cooperate in discovery, or (c) failed to comply with requirements of confidentiality.

## Article Sixteen:  Front Pay Option Instead of Reinstatement

16.1  If the Arbitrator orders the reinstatement of a terminated Employee, there may be situations where the Employee does not want to return to work or the Company does not wish to reinstate the Employee. In such situations, the Arbitrator, at the request of either party, shall issue a supplementary award granting the terminated Employee reasonable front pay instead of reinstatement, in accordance with the applicable state or federal law.

## Article Seventeen:  Effect of Arbitrator's Decision

17.1  By accepting or continuing employment with the Company, new and current Employees agree, as a condition of their employment, that all covered claims are subject to the DRP process, and that an Arbitrator's award shall be a final, binding, and exclusive determination of their covered claims.

17.2  The Company also agrees that all covered claims are subject to the DRP process and that an Arbitrator's award shall be a final, binding and exclusive determination of its covered claims.

17.3  Unless applicable law provides otherwise, the Arbitrator's award will not be subject to review or appeal, except as provided by the Federal Arbitration Act, 9 U.S.C.A. Sections 1-14.

17.4  Neither party shall agree to publish the Arbitrator's award or arrange for publication of the award.  The award shall have no legal effect on the claims of Employees who are not party to the arbitration.  Neither party may cite the Arbitrator's decision as binding precedent in any other arbitration, or in any administrative or court proceeding.  However, either party may cite the decision in order to appeal the Arbitrator's award and/or to seek dismissal of the same claims in litigation.

## Article Eighteen:  Arbitration Cost and Fees

18.1  The Company will pay:

    (a)  any filing and other administrative fees required by the Association;

    (b)  the Arbitrator's fees and reasonable travel expenses;

    (c)  the cost of renting an arbitration hearing room;

    (d)  the Employee's salary or wages up to a maximum of seven hearing days (if still employed by the Company) for the time spent at the arbitration hearing; and

    (e)  the salary or wages of current Employees called as witnesses for the time spent at the arbitration hearing up to a maximum of two hearing days.

18.2  Each party shall bear all costs normally associated with litigation including but not limited to, its own experts' and/or attorneys' fees.  The Arbitrator may award costs, including reasonable experts' and/or attorneys' fees, to the Employee as provided under applicable law.

## Article Nineteen:  Confidentiality

19.1  All aspects of the arbitration including, without limitation, the record of the proceeding, are confidential and shall not be open to the public except:

    (a)  to the extent that both parties agree otherwise in writing;

    (b)  as may be appropriate in any subsequent proceedings between the parties; or

    (c)  as may otherwise be appropriate in response to a governmental agency request pursuant to, or as otherwise required by, law.

19.2  At the request of either party, or upon his or her own initiative, the Arbitrator shall issue protective orders appropriate to the circumstances and shall enforce the confidentiality of the arbitration as set forth in this Article 19.

## Article Twenty:  Miscellaneous

20.1  Court and Administrative Proceedings - Nothing in the DRP shall prevent the Company or the Employee from bringing a court proceeding pursuant to the applicable statute to vacate or enforce an Arbitrator's decision, to compel arbitration, or to seek temporary equitable relief in aid of arbitration.

20.2  Agreements to Modify DRP Procedures - Once the arbitration process has begun, the Company and the Employee may agree in writing to vary the DRP procedures at any time before the Arbitrator issues his or her decision.

# DISPUTE RESOLUTION PROGRAM: HOW IT WORKS



# QUESTIONS AND ANSWERS FOR EMPLOYEES

**1. *What is the Dispute Resolution Program?***

The Dispute Resolution Program ("DRP") is designed to resolve workplace disputes in a simple, fair, timely and economic way. It consists of three levels: Level 1 - Local Management Review, Level 2 - Mediation and Level 3 - Binding Arbitration.

**2. *Who pays the cost of the program?***

There is no cost to the Employee to participate in Level 1 - Local Management Review. If the Employee's claim proceeds to Level 2 - Mediation, the Employee must pay a $50 fee. If the Employee's claim proceeds to Level 3 - Binding Arbitration, the Employee must pay a $125 fee. If the Employee hires an attorney or engages in discovery, the Employee must pay the costs of those services. The Company pays for all other fees and expenses for the mediation and arbitration.

**3. *What's the difference between Personnel Communications and DRP?***

Personnel Communications is a program to provide employees with a means to confidentially discuss any problem or concern they may have with a knowledgeable and impartial third party. It is an informal resource available to both management and employees but is not part of the formal DRP problem-solving proceedings. The DRP is a formal procedure that is designed to resolve disputes at the lowest level, while also providing a mechanism for final and binding resolutions of disputes that cannot be resolved locally.

**4. *What do I do if my supervisor ignores the DRP?***

Your supervisor is the first person you should approach to resolve a workplace dispute. If your supervisor is unresponsive or does not address the issue to your satisfaction, you may go to the next level of supervision or contact your local Human Resources representative, the Personnel Communications Department or the DRP Administrator at 1-866-377-3772.

**5. *What if my supervisor is the problem?***

Normally, you should go to your supervisor to resolve the dispute. If you are uncomfortable going to your supervisor, you should go to the next level of supervision or contact your local Human Resources Representative, the Personnel Communications Department or the DRP Administrator at 1-866-377-3772.

**6. *What happens if my supervisor starts to make things difficult for me after I complain?***

The Company forbids retaliation against you for using or participating in the DRP. If you feel that a supervisor or any other Employee is retaliating against you, you should take it to a higher level of supervision, to your local Human Resources representative, the Personnel Communications Department or the DRP Administrator at 1-866-377-3722.

**7. *Can I use the DRP to solve any problem that happens at work?***

You may use the DRP to address most work-related concerns or problems. The DRP is not available for disputes involving workplace injuries or benefits disputes involving the Company's benefit plans.

8. *Does the DRP require me to complete Level 1 before going to Levels 2 and 3?*

Yes. All disputes involving covered claims must complete Level 1 - Local Management Review before proceeding to Level 2 - Mediation or Level 3 - Binding Arbitration. Level 1 may contain one or several steps - it depends upon the design at your location.

9. *What is a covered claim?*

A covered claim is any claim relating to or arising out of the employment relationship between you and the Company (and/or employees acting within the scope of their employment) alleging unlawful or illegal conduct on the part of the Company including, for example, claims of employment discrimination and harassment based on age, race, sex, disability, religion, national origin, veteran status, citizenship, or other characteristics protected by law, or claims for workplace accommodation.

10. *Do you have to go through mediation before proceeding to arbitration?*

Yes, if you have a covered claim, you must exhaust mediation before you go to arbitration. This is required because many workplace disputes are resolved during the mediation stage.

11. *What's the difference between mediation and arbitration?*

Mediation is a process in which those involved in a dispute try to resolve it with the aid of a neutral third party, the mediator. In this process, the mediator helps to open up lines of communication, but does not issue a final decision. It is up to the parties to resolve the dispute at this level. With arbitration, a dispute is submitted to a neutral third party for a final decision which cannot be overturned by the courts, except in rare circumstances.

12. *How does mediation work?*

After a mediator is chosen by the parties, a mutually agreeable date for the mediation will be selected. At the mediation, the mediator helps the parties try to resolve their disputes by opening up communications, identifying options for resolving the dispute and offering an objective perspective. In doing so, the mediator may, among other things, question each party, individually or collectively, listen to arguments and make suggestions to the parties.

13. *How does arbitration work?*

After an arbitrator has been chosen by the parties, a hearing date will be selected that is mutually agreeable with the Employee, the Company and the Arbitrator. Prior to the hearing, the parties may engage in "discovery". Discovery refers to the process of gathering information by requesting documents and asking questions related to the claim. The most common forms of discovery used are document requests and depositions. Additional discovery may be permitted by the Arbitrator if the parties request it and the Arbitrator agrees.

The arbitration hearing will generally follow the same format as a court hearing, but is much less formal. The order of events is usually as follows: opening statement by the Employee and the Company, direct and cross examination of the witnesses and closing arguments by the Employee and the Company.

Each party will have the opportunity to submit a written brief to the Arbitrator. The Arbitrator must issue a signed, written decision within 30 days after the hearing or receipt of the briefs, whichever is later. The Arbitrator will apply the applicable federal and/or state law, as appropriate, and can provide any remedy that could have been granted by a judge or a jury in a court trial of the particular claim. The Arbitrator's decision is final and binding on both the Employee and the Company.

**14. *What type of documents can be obtained in discovery?***

Both the Employee and the Company are permitted to obtain documents related to the dispute from the other side. Documents requested must be relevant in that they help to prove or disprove an alleged fact that is related to the covered claim. Each side is responsible for paying the costs associated with a request for documents. The Arbitrator may issue protective orders, if requested, to protect the privacy of the parties, witnesses or others. In general, this means that certain documents must be kept confidential and cannot be disclosed to other individuals.

**15. *How do depositions work?***

Depositions involve asking the other party questions, under oath, to learn about the other party's or witnesses' claim(s). Each party may depose all expert witnesses identified by the other side and up to two other individuals. It is likely that the Company will want to take the Employee's deposition. The Employee may want to take the deposition of the key decision maker involved in his or her case. The party requesting the deposition is responsible for retaining a stenographer to record and transcribe the deposition so that the testimony is preserved. The cost associated with any transcript will be the responsibility of the requesting party.

**16. *How does arbitration differ from a court trial?***

There will be no jury in arbitration. Rather, the Arbitrator will decide your covered claim. With a court decision an appeal may be filed, causing lengthy delays. With arbitration, the decision is final, except in rare circumstances. An arbitration proceeding is usually much more informal than a case in court. The Arbitrator is an expert in employment law who serves as a neutral third party. The proceeding is held in private offices instead of in a public courthouse. Because arbitration is faster and less formal, it costs both parties much less to prepare the case. There is no difference in the type of relief available.

**17. *Can I have legal representation at mediation and/or arbitration?***

Neither you nor the Company may bring legal counsel to any meetings conducted at Level 1. You may be represented by legal counsel of your own choosing during mediation and arbitration. The costs of legal representation are your sole responsibility. If you are represented by counsel, the Company will also be represented by legal counsel. If you do not have legal counsel present, the Company will be represented by an appropriate member of management.

**18. What are the time limitations for using DRP?**

Claims may be submitted to Level 1 at any time.  However, if it is a covered claim, and the employee wants to preserve his or her right to submit the dispute to Levels 2 and 3, the claim must be submitted to Level 1 within 180 days of the date the dispute arose or before the expiration of the applicable statute of limitations, whichever is longer.  To request Mediation, the Employee must submit the Anheuser-Busch Request for Mediation form to the DRP Administrator along with the required $50 fee, within 30 calendar days of the date of the Company's Final Determination at Level 1.

To request Binding Arbitration, the Employee must submit the Request for Binding Arbitration form to the DRP Administrator along with the required $125 fee, within 30 calendar days of receipt of the DRP Administrator's Notice of Unsuccessful Mediation.

**19. What happens if I file a lawsuit against the Company for a workplace dispute?**

If you file a lawsuit, the Company will ask the court to stay the proceeding and refer it to the DRP.

**20. Is there any limit on the amount of award I can win through arbitration?**

The Arbitrator has the same authority as a judge or a jury in making awards to Employees.  That means in arbitration, it's possible for you to recover anything you might seek through the court system.

**21. What happens if I'm terminated or laid off from the Company?  Does the DRP still apply to me?**

If you are terminated or laid off from the Company, you still must resolve any workplace disputes you have against the Company through the DRP instead of through the court system.  You must file these claims within the applicable DRP time limitation.

**22. Will I still be able to go to the Equal Employment Opportunity Commission (EEOC)?**

Yes.  The Dispute Resolution Program applies to relief you might seek personally through the courts for a workplace dispute.  You are still free to consult the appropriate state agency, the EEOC or any other government regulatory body regarding your workplace problem.

**23. How do I get more information about the program?**

For more information about the DRP contact your local Human Resources representative, or call Anheuser-Busch's Personnel Communications Department at 1-800-325-9393, or the DRP Administrator at 1-866-377-3772.